IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ANTHONY W. CALVIN,               )
                                 )
                                 )
        v.                       )        No. 3:05-0109
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security[1] )


To:    The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform a light level of work during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 11) should be denied.

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

# I. INTRODUCTION

The plaintiff filed an application for DIB on July 17, 2002, alleging disability due to neck and back pain, blurred vision, high blood pressure, and anxiety attacks, with a date of onset on January 1, 2000. (Tr. 46, 64, 89.) The plaintiff's claim was denied initially and upon reconsideration. (Tr. 31-33, 36-37.) A hearing was held before Administrative Law Judge ("ALJ") Peter Edison on August 18, 2004 (Tr. 318-40), and the plaintiff amended his alleged onset date to January 1, 2001. (Tr. 321-22.) The ALJ delivered an unfavorable decision on September 24, 2004 (Tr. 11-18), and the plaintiff petitioned for review of that decision before the Appeals Council. (Tr. 8-10.) On December 8, 2004, the Appeals Council denied the plaintiff's request for review (Tr. 3-5), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on June 14, 1955, and was 45 years old as of January 1, 2001, his alleged onset date. (Tr. 46, 321-22.) He completed the tenth grade (Tr. 70, 311) and subsequently earned a GED. (Tr. 115, 322.) The plaintiff's past jobs included installing windows and doors, loading and unloading trucks, and working as Deputy Sheriff in the Davidson County Sheriff's Department. (Tr. 65, 73, 323-24.)

## A. Chronological Background: Procedural Developments and Medical Records

The plaintiff presented to Dr. Robert T. Lim, Jr., a family practitioner, on July 7, 1999, with complaints of back problems and Dr. Lim diagnosed him with lower back pain and nicotine abuse. (Tr. 264.)  Dr. Lim prescribed Soma,[2] Lortab,[3] and Xanax[4] for the plaintiff. *Id.*

On August 6, 1999, Dr. Lim again examined the plaintiff for complaints of back and knuckle pain, and diagnosed him with hypertension, chronic lower back pain, tobacco use, and anxiety. (Tr. 263.)  On September 7, 1999, the plaintiff reported that his hand pain was better and that while his back pain was unchanged, it was controlled by the medications. (Tr. 262.)  Dr. Lim prescribed Accupril[5] and Zocor[6] to the plaintiff, and renewed his prescriptions for Soma, Lortab, and Xanax. *Id.*  Dr. Lim's diagnoses of the plaintiff remained unchanged over the next several examinations. (Tr. 258-61.)  On December 21, 1999, the plaintiff complained of additional shoulder pain and spasms. (Tr. 257-61.)  Dr. Lim changed the plaintiff's prescription from Lortab to Oxycontin[7] and Percocet.[8] (Tr. 257.)  When the plaintiff returned to Dr. Lim on January 3, 2000, he reported that the

---

[2] Soma is used for the relief of discomfort associated with acute and painful musculoskelatal conditions. Physicians Desk Reference 1931 (63rd ed. 2009) ("PDR").

[3] Lortab is prescribed for the relief of moderate to moderately severe pain. PDR at 3143.

[4] According to WebMD, Xanax is used to treat anxiety and panic disorders by producing calming effects.

[5] According to WebMD, Accupril is prescribed to treat hypertension.

[6] Zocor is given to treat patients with hyperlipidemia. PDR at 2136.

[7] Oxycontin treats moderate to severe pain that is expected to last for an extended period of time. PDR at 2593.

[8] Percocet is prescribed to treat moderate to moderately severe pain. PDR at 1127.

3

Oxycontin and Percocet "did not help him as well." (Tr. 256.)  Dr. Lim took him off of Oxycontin and Percocet and re-prescribed Lortab. *Id.*

Dr. Lim referred the plaintiff for a series of tests to determine the cause of his back and neck pain. (Tr. 135-38, 168-69.)  An x-ray on July 7, 1999, of the plaintiff's lumbar spine showed that he had a "mild loss of disc height at L4-5 and L5-S1" and "non-specific age-related degenerative changes." (Tr. 138.)  An MRI of the lumbar spine on August 9, 1999, showed that the plaintiff had a "diffuse posterior herniation of the L4-5 intervertebral dis[c]" and "compression of the thecal sac with stenosis of the right lateral recess zone." (Tr. 137.)

The plaintiff had three x-rays on his left shoulder, cervical spine, and thoracic spine. (Tr. 135-36.)  The left shoulder x-ray showed "no evidence of fracture, dislocation or other bony abnormality." (Tr. 135.)  The cervical spine x-ray exhibited "no evidence of fracture or sublaxation," but did reveal a "small bridging anterior osteophyte at C4-5" and "loss of normal cervical lordosis with mild kyphosis." *Id.*  The thoracic spine x-ray found "no evidence of fracture" but did show "moderate spondylosis within the mid and lower dorsal spine with anterior bridging osteophytes at T7-8, T8-9, and T10-11" and "disc calcification at T10-11." (Tr. 136.)

The plaintiff had a Cervical Spine MRI on January 25, 2000, which showed a "large left paracentral and foraminal disc protrusion at C6-7 compressing the spinal cord and markedly narrowing the left lateral recess and neural foramen." (Tr. 168.)  The MRI also revealed a "small left paracentral disc protrusion at C7-T1 moderately narrowing the left lateral recess." (Tr. 168-69.)

On February 1, 2000, Dr. Lim referred the plaintiff to neurosurgeon Dr. Ronald Zellum. (Tr. 254.)  On February 23, 2000, Dr. Zellum diagnosed the plaintiff with "left sided C6-7 herniated

4

disc with left C7 greater than C8 radiculopathy." (Tr. 139-40.) He also prescribed Vioxx[9] for the

plaintiff and ordered a cervical myelogram and post myelogram CAT scan to be performed as soon

as possible. (Tr. 140.) Two days later, the CAT scans revealed a "large herniated disc on the left

at C6-7." (Tr. 141.) On February 28, 2000, after reviewing the results, Dr. Zellum recommended

a cervical diskectomy[10] and allogenic fusion with plate fixation. *Id.* Dr. Zellum performed the

surgery on March 7, 2000, and the plaintiff was discharged on March 8, 2000. (Tr. 143.)

During subsequent monthly visits with Dr. Lim, the plaintiff began to complain of blurred

vision in his right eye, and continued to report neck and back pain and anxiety. (Tr. 252.) On

April 2, 2000, Dr. Lim diagnosed the plaintiff with ptosis[11] of the right eye and on June 5, 2000,

diagnosed him with Horner's Syndrome.[12] (Tr. 224, 250, 252.) Dr. Lim attributed the plaintiff's

vision impairments to complications caused by the surgery that the plaintiff underwent earlier that

year. (Tr. 224.) An MRI of the brain performed by Dr. Stephen Humphrey on April 11, 2000, also

revealed ptosis of the right eyelid and Diplopia.[13] (Tr. 164-67.)

---

[9] According to WebMD, Vioxx is no longer available in the United States but was once used to treat joint damage causing pain and loss of function.

[10] A cervical diskectomy is the excision of an intervertebral disc pertaining to the neck. Dorland's Illustrated Medical Dictionary 337, 545 (30th ed. 2003) ("Dorland's").

[11] Ptosis is the "drooping of the upper eyelid from paralysis of the third nerve or from sympathetic innervation." Dorland's at 1542.

[12] Horner's Syndrome is "sinking in of the eyeball, ptosis of the upper eyelid, slight elevation of the lower lid, constriction of the pupil, narrowing of the palpebral fissure, anhidrosis and flushing of the affected side of the face; caused by paralysis of the cervical sympathetic nerves." Dorland's at 1820.

[13] Diplopia is "the perception of two images of a single object," more commonly known as "double vision." Dorland's at 525.

On May 1, 2000, and June 5, 2000, Dr. Lim changed the plaintiff's medication prescription from Lortab to Oxycontin. (Tr. 250-51.) However, as of June 30, 2000, neither Lortab nor Oxycontin was a part of the plaintiff's medication regimen, and Dr. Lim noted in his August 4, 2000, progress note that Soma and Xanax were "controlling" the plaintiff's recent back spasms. (Tr. 248-49.) The plaintiff's monthly visits with Dr. Lim continued until January 8, 2001, during which time Dr. Lim prescribed essentially the same medications. (Tr. 243-47.)

On June 1, 2001, the plaintiff returned to Dr. Lim and he prescribed medications for back and neck pain, anxiety, hyperlipidemia, and hypertension. (Tr. 242.) Over the next year and a half, Dr. Lim's diagnoses and prescription renewals remained largely unchanged. (Tr. 221-41.) During that time, Dr. Lim regularly stated in his progress notes that the medications were working well and controlling the plaintiff's symptoms. (Tr. 231, 232, 233, 237, 241.) On February 10, 2002, and March 11, 2002, Dr. Lim noted that the plaintiff had been working out in the gym three times a week. (Tr. 232-33.) On December 9, 2002, Dr. Lim diagnosed the plaintiff with major depressive disorder. (Tr. 222.) On February 10, 2003, he prescribed Paxil,[14] in addition to the plaintiff's previous medications. (Tr. 220.) On October 18, 2002, following the plaintiff's application for DIB, Dr. Lim wrote a letter to the Social Security Administration, stating that "[the plaintiff] still has mild weakness over his right arm and hand, blurring of vision with his right eye, and marked limitation of motion of his neck . . . he is severely limited in his ability to work." (Tr. 224.)

On referral from the State of Tennessee Disability Determination Section ("DDS"), Dr. Bruce Davis examined the plaintiff on August 22, 2002. (Tr. 155.) Dr. Davis noted that the

---

[14] Paxil is prescribed for the treatment of major depressive disorder and general anxiety disorder. PDR at 1636-37.

plaintiff's uncorrected vision in his right eye was 20/30, in his left eye was 20/30, and in both eyes was 20/25. (Tr. 156.) He ordered a limited x-ray of the lumbar spine and it revealed a "loss of disc height at L4-5 and L5-S1." (Tr. 158.) Dr. Davis also ordered a cervical spine x-ray that indicated a "spur formation anteriorly, C5-6," and "well-maintained disc spaces." (Tr. 161.) Dr. Davis diagnosed the plaintiff with Class 1 Obesity, hypertension, hyperlipidemia, neck and back "disease," and anxiety/depression. (Tr. 157). Dr. Davis stated that in an eight hour workday the plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds, stand/walk for six hours, and sit for eight hours. *Id.* Dr. Davis also opined that the plaintiff had "limited bending, lateral neck motion" and physical/environmental limitations regarding "heat/humidity, climbing/heights." *Id.*

On August 30, 2002, Dr. Frederic Cowden, a non-examining consultative physician, completed a physical residual functional capacity assessment ("RFC")[15] on the plaintiff. (Tr. 186-91.) Upon review of the plaintiff's medical history, Dr. Cowden opined that the plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds. (Tr. 187.) He further reported that in an eight hour workday the plaintiff could stand/walk or sit for six hours. *Id.* Dr. Cowden found no other postural, manipulative, visual, communicative, or environmental limitations. (Tr. 188-89.)

On December 23, 2002, Dr. Robin Richard, another non-examining consultative physician, completed a physical RFC and found that in an eight hour workday the plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, and stand/walk and/or sit for six hours. (Tr. 193.) He opined that the plaintiff had no manipulative, visual, communicative or environmental

---

[15] RFC is a measure of what a claimant can do despite his impairments. 20 C.F.R. § 404.1545.

limitations. (Tr. 195-96.) Dr. Richard did note certain postural limitations, finding that the plaintiff could only occasionally climb, stoop, and/or crawl and frequently balance, kneel, and/or crouch. (Tr. 194.)

On January 13, 2003, Dr. Thomas Pettigrew, ED.D., a consultative psychologist, conducted a psychological examination of the plaintiff. (Tr. 200-04.) Dr. Pettigrew reported that during the interview, the plaintiff appeared to be "at most mildly anxious" and showed no signs of acute psychological distress. (Tr. 203.) He also found the plaintiff's attention, comprehension, memory, concentration, and other cognitive functions to be intact. *Id.* Dr. Pettigrew further noted that the plaintiff appeared to be capable of relating well with others and would be able to manage disability funds. (Tr. 204.)

In another psychiatric review on February 10, 2003, Dr. Edward Sachs, Ph.D., a non-examining consultative psychologist, determined that the plaintiff was mildly restricted in his activities of daily living and in maintaining social functioning, concentration, persistence, or pace. (Tr. 215.) He reviewed the plaintiff's previous psychological evaluation and noted that the plaintiff's daily living activities indicated that he had "no significant psychologically related loss of functioning." (Tr. 217.)

On August 5, 2003, Dr. Lim prescribed Zyprexa[16] for the plaintiff and continued to diagnose him with hypertension, hyperlipidemia, back and neck pain, and anxiety. (Tr. 266-67.) On August 10, 2003, Dr. Lim completed an Assessment of Ability, finding that in an eight hour workday the plaintiff could not sit at all, could stand/walk one hour before changing position, must

---

[16] Zyprexa is prescribed for the treatment of patients with schizophrenia and bipolar disorder. PDR at 1884-85.

Case 3:05-cv-00109    Document 17    Filed 08/26/09    Page 8 of 32 PageID #: 74

lie down for two hours and elevate his legs for five hours, could occasionally lift up to nine pounds,

could rarely lift up to 19 pounds, could spend only 30 minutes reaching, and could spend no time

handling or stooping. (Tr. 218-19.) Dr. Lim severely restricted the plaintiff's exposure to marked

changes in temperature and humidity; moderately restricted his exposure to unprotected heights,

being around moving machinery, and driving automotive equipment; and mildly restricted his

exposure to dust, fumes and gases. (Tr. 219.) Further, Dr. Lim found marked restrictions in the

plaintiff's activities of daily living and in his ability to maintain social functioning, concentration,

persistence, or pace. *Id.* Dr. Lim opined that the plaintiff exhibited "[r]epeated episodes of

decompensation, each of extended duration." *Id.*

Dr. Lim continued to examine the plaintiff on a monthly basis, and his diagnoses and

medication prescriptions remained largely unchanged. (Tr. 269-99.) On February 5, 2004, he added

Altace[17] and on April 9, 2004, he added Lexapro[18] to the plaintiff's prescription regime. *Id.* On

May 4, 2004, Dr. Lim diagnosed the plaintiff with Dysmetabolic Syndrome, for which he prescribed

the plaintiff Metformin. (Tr. 300-303.) In response to the plaintiff's complaints of increased blurred

vision, Dr. Lim referred the plaintiff to an opthamologist on July 6, 2004. (Tr. 308-311.)


### B.  August 18, 2004 Hearing: Testimony of the Plaintiff and the Plaintiff's Sister

The plaintiff testified that he last worked on a full-time basis in February of 2000, for

Unlimited Windows. (Tr. 322-23.) He reported that he installed windows and doors for Unlimited

---

[17] According to WebMD, Altace is used to treat hypertension.

[18] Lexapro is used for the treatment of major depressive disorder and general anxiety
disorder. PDR at 1175.

Windows for "about 12 years," which required lifting over 100 pounds. *Id.* The plaintiff testified that he worked for Unlimited Windows until his neck surgery and that his condition worsened after surgery. (Tr. 324-25.) Before his job at Unlimited Windows, he worked for "about four or five years" as a full-time deputy sheriff and for "[m]aybe three, four years" unloading trucks for the Local 46 Stagehand Union. (Tr. 323-24.)

The plaintiff complained of chronic neck and lower back pain that prevented him from lifting anything. (Tr. 325.) He explained that when he experiences back pain, he is not comfortable standing up, sitting down, or lying down. *Id.* The plaintiff further complained of problems with his right eye that surfaced after his surgery and testified that he purchased reading glasses for his blurred vision. (Tr. 325-26.) When asked if the reading glasses helped correct his vision, the plaintiff testified that his vision was "still a little blurry" and indicated that he needed to get a stronger pair. *Id.* He also reported that he had an appointment with the eye doctor at the end of the month. (Tr. 325.) The plaintiff noted that the pain in his neck, back, and shoulders prevented him from being able to lift his arms. (Tr. 328.) The plaintiff testified that although he could load clothes into the washing machine, his daughter would dry and fold the clothes for him. *Id.* He reported that his sister would take his daughter to school and that he would pick her up. (Tr. 328-29.)

The plaintiff also complained of anxiety that began prior to his surgery. (Tr. 329.) He explained that his "panic attacks" occur when he is in a big crowd, around strangers, or driving. *Id.* The plaintiff testified that he carries a bottle of Xanax in his car and that if he takes one, "then [he's] okay." *Id.* He related that his panic attacks occur only when he is around people or driving, but not when he is at home. (Tr. 329-30.)

10

The plaintiff reported that on a typical day, he wakes his daughter up and makes sure that she gets ready for school. (Tr. 330.) The plaintiff testified that after his sister takes his daughter to school he lies around, watches television, and occasionally washes a load of laundry. *Id.* He further reported that he takes Xanax before driving to pick up his daughter from the front of the school, but he tries to avoid people in the pickup line. *Id.* He testified that he can sit consecutively for a couple of hours in his vibrating "lounge chair" and that elevating his feet makes him feel better. (Tr. 330-31.) The plaintiff testified that he takes Soma before he goes to bed to help him sleep. (Tr. 331.) He reported that the pain medications have no side effects, but that he sleeps two to three hours throughout the day because he generally does not sleep well at night. (Tr. 331-31.) The plaintiff testified that his daughter does the housework, his nephew cuts the grass, and his sister shops for groceries and cooks for him. (Tr. 333-34.)

After being seated in the courtroom for 20 to 30 minutes, the plaintiff reported that he was uncomfortable and that his back hurt. (Tr. 332.) He also testified that he would have to take a Xanax to work in a crowded area. (Tr. 332-33.) The plaintiff related that he could stand or walk for "maybe an hour" before he would have to change positions. (Tr. 334.)

Michelle Eerebout, the plaintiff's sister, testified at the hearing that she has worked for Unlimited Windows for 21 or 22 years and she described the plaintiff as "a mule" for the company before his injury. (Tr. 335-39.) She related that because the plaintiff could no longer work after his injury, he was given brief employment with Unlimited Windows as "charity." (Tr. 336.)

Ms. Eerebout reported that she lives next door to the plaintiff and helps him on a daily basis. (Tr. 337.) She testified that she cooks him dinner, and takes him places, including his daughter's ball games. *Id.* Ms. Eerebout testified that the plaintiff does not walk very much and is "just

uncomfortable," and she described him as being "nervous" and "hyper" away from his home.
(Tr. 338.)  She also related that she thought his vision was getting worse. (Tr. 339.)


## III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on September 24, 2004. (Tr. 14-18.)  Based on the record, the ALJ made the following findings:

1. The claimant met the insured status requirements of the Act as of the alleged onset date.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date.

3. The claimant has "severe" impairments including degenerative disc disease.

4. The claimant's impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth at 20 C.F.R., Part 404, Subpart P, and Appendix 1.

5. The claimant's allegations of pain and functional limitations are not fully credible for the reasons discussed above.

6. The claimant retains the residual functional capacity to perform a full range of light work.

7. The claimant cannot perform any past relevant work.

8. The claimant is a younger individual with a limited education.

9. The transferability of any acquired skills is not a material issue.

10. Based on the claimant's age, education, work experience, and residual functional capacity, Rules 202.18 / 202.19 of the Medical-Vocational Guidelines direct a conclusion of "not disabled."

(Tr. 18.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot*

13

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R.

14

§§ 404.1520(d) and 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform,

Case 3:05-cv-00109   Document 17   Filed 08/26/09   Page 15 of 32 PageID #: 81

he is not disabled.[19]  *Id.  See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4).  *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B.  The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five step process. (Tr. 18.) At step one, the ALJ found that the plaintiff successfully demonstrated that he had not engaged in substantial gainful activity since January 1, 2001, the alleged onset date of disability. *Id.*  At step two, the ALJ found that the plaintiff suffered from the severe impairment of degenerative disc disease. *Id.*  At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 404. *Id.*  At step four, the ALJ found that the plaintiff was limited to work performed at a light exertional level and could not perform any past relevant work. *Id.*  At step five, the ALJ found that the plaintiff had the residual functional capacity to perform a full range of light work. *Id.*

---

[19] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied.  *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

16

The effect of this decision was to preclude the plaintiff from DIB benefits and to find him not disabled, as defined in the Social Security Act, at any time after January 1, 2001, through the date of the decision.

### C. The plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in assessing the opinion of the plaintiff's treating physician, Dr. Lim, and in concluding that his right eye condition and anxiety disorder were not "severe." He also alleges that the ALJ erred in failing to consider the impact of the plaintiff's obesity on his RFC, and in applying the Medical-Vocational Guidelines to the plaintiff. The plaintiff further contends that substantial evidence does not support the ALJ's finding that the plaintiff could perform a full range of light work.

Before undertaking the plaintiff's specific assignments of error, this Court finds it necessary to address the issue of post-hoc rationalization raised by the plaintiff in his reply brief. Docket Entry No. 16 at 7-13. The plaintiff correctly points out that the U.S. Supreme Court has observed that

> [A] simple but fundamental rule of administrative law . . . is . . . that a reviewing court, in dealing with a determination or judgment which an agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action.

*SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), *quoted in Burlington Truck Lines, Inc.*, 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). The Court has also made it clear that reviewing courts should not accept agency counsel's post hoc rationalizations as a substitute for the reasoning supplied by the agency adjudicator. *See, e.g.*, *NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 715 n.1, 121 S.Ct. 1861, 1868 n.1, 149 L.Ed.2d

17

939 (2001) (citing *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 685 n. 22, 100 S.Ct. 856, 864 n.22, 63 L.Ed.2d 115 (1980)). In *Morehead Marine Servs. v. Washnock*, 135 F.3d 366, 375 (6th Cir. 1998), the Sixth Circuit addressed the issue of post hoc rationalization:

> Under the Administrative Procedure Act, 5 U.S.C. § 557(c)(3)(A), an ALJ's decision is required to include a discussion of "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A). Strict adherence to this statutorily-imposed obligation "is critical to the appellate review process.... The courts have respected this requirement [in § 557(c)(3)(A) ] by remanding cases where the reasoning for the a.l.j.'s [sic] conclusion is lacking and therefore presents inadequate information to accommodate a thorough review." *Director, OWCP v. Congleton*, 743 F.2d 428, 429 (6th Cir.1984). Absent a specific, and accurate, reference to the evidence supporting an ALJ's decision, we hold that the ALJ has failed to fulfill his duty to explain as required by § 557(c)(3)(A), and we must remand for a proper explanation. *Accord See v. Washington Metro. Area Transit Auth.*, 36 F.3d 375, 384 (4th Cir.1994) (noting that the Fourth Circuit "has long required specific references to the evidence supporting an ALJ's decision as part of the ALJ's 'duty of explanation'").

However, none of the above cited cases involve judicial review under the Social Security Act. The Supreme Court has recognized that, as compared to traditional review of agency actions, there is a unique interplay between the federal courts and the Social Security Administration. *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S.Ct. 2248, 2254, 104 L.Ed.2d 941 (1989) ("As provisions for judicial review of agency action go, § 405(g) is somewhat unusual. The detailed provisions for the transfer of proceedings from the courts to the [Commissioner] [on remand] and for the filing of the [Commissioner's] subsequent findings with the court suggest a degree of direct interaction between a federal court and an administrative agency alien to traditional review of agency action under the Administrative Procedure Act."). *See also Sims v. Apfel*, 530 U.S. 103, 109-112, 120 S.Ct. 2080, 2084-86, 147 L.Ed.2d 80 (2000) (discussing the unique nature of social security proceedings as reason for not applying the traditional administrative issue-exhaustion rule on judicial review). While other circuit courts of appeals have adopted *Chenery* in the context of

18

social security disability proceedings, *see, e.g., Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003) and *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001),[20] the Sixth Circuit has not.[21]

In fact, the Sixth Circuit has held that reviewing courts may look "to any evidence in the record regardless of whether it has been cited by the Appeals Council" for substantial support of the Commissioner's ultimate conclusion. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001); *Queen City Home Health Care Co. V. Sullivan*, 978 F. 2d 236, 243 (6th Cir. 1992); *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Sixth Circuit did not consider these decisions in light of *Chenery*, but given the Supreme Court's inclination to distinguish social security disability determinations from general administrative law proceedings, continued deference to *Walker* and its progeny is appropriate. In addition, *Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058 (6th Cir. Aug. 18, 2009), also lends some support to that conclusion. Even though the Court did not address the plaintiff's post-hoc rationalization assertion of error, it did note that "[the plaintiff's] contention is belied by the record, as the district court opinion does not offer

_____

[20] In *Golembiewski* the Seventh Circuit stated that "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ." 322 F.3d at 916. In *Fargnoli* the Third Circuit determined that the District Court ran afoul of *Chenery* when it "attempted to rectify [the ALJ's failure to consider all of the relevant and probative evidence] by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ." 247 F.3d at 44 n.7.

[21] The Sixth Circuit was faced with this issue in *Berryhill v. Shalala*, 1993 WL 361792, at *7 (6th Cir. Sept. 16, 1993), and although the Court resolved the case on other grounds, it did note that "*in large part*, an agency's decision must be affirmed on the grounds noted in [that] decision." (Emphasis added.) The phrase "in large part" apparently indicates the Sixth Circuit's willingness to deviate from the principle set forth in *Chenery* that requires a reviewing court to consider the "propriety of such action solely by the grounds invoked by the agency." *Chenery*, 332 U.S. at 196.

19

a 'revised rationale.' Rather, the court simply referenced additional evidence in the record to establish that the ALJ's decision was supported by substantial evidence." *Poe*, 2009 WL 2514058 at *9 n. 8.  Thus it appears that there is a distinction between the court's supplanting its own rationale for that of the agency, which is impermissible, and the court's using additional record evidence to bolster the agency's rationale, which is permissible.[22]

### 1.  The ALJ properly assessed the medical evidence of the plaintiff's treating physician.

Dr. Lim first treated the plaintiff on July 7, 1999, for complaints of back pain. (Tr. 264.) Over the next five years, Dr. Lim conducted follow-up visits with the plaintiff on almost a monthly basis (Tr. 220-316) and given that regularity, he is classified as a treating source under 20 C.F.R. § 404.1502.[23]  The plaintiff argues that the ALJ erred by failing to give the appropriate weight to

---

[22] In the first scenario, a court would be stepping into the shoes of the agency if it substituted its reasoning for the faulty reasoning of the agency in order to come to the same original conclusion. The Supreme Court clearly does not permit that manner of judicial review. *See Kentucky River Cmty. Care, Inc.*, 532 U.S. at 715 n.1.  In the second scenario, a court can agree with the rationale set forth by the Commissioner to support his decision and then find additional evidence in the record to support that determination.

[23] A treating source, defined by 20 C.F.R. § 404.1502, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

Case 3:05-cv-00109   Document 17   Filed 08/26/09   Page 20 of 32 PageID #: 86

Dr. Lim's opinion and by failing to provide good reason for rejecting Dr. Lim's opinion. Docket Entry No. 12, at 23-24.

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 404.1527(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004).

The functional limitations assigned by Dr. Lim were not supported by clinical or laboratory testing, his treatment notes, or the evidence in the record. The plaintiff argues that the "record is filled with objective evidence" supporting Dr. Lim's RFC findings. Docket Entry No. 12, at 16. However, four of the six x-rays upon which the plaintiff relies were taken over a six month period immediately preceding his surgery on March 7, 2000. (Tr. 135-138, 143-45, 168-69.) After the plaintiff's surgery, Dr. Lim examined the plaintiff on numerous occasions over a four year period, but he referred the plaintiff for only two x-rays. (Tr. 161, 196.) An x-ray of the plaintiff's cervical spine revealed "[s]pur formation anteriorly, C5-6 [and] [d]isc spaces well-maintained" (Tr. 161), and an x-ray of his right knee disclosed "degenerative spurring" involving the tibial spines but minimal spurring of the patella. (Tr. 296.) Further, Dr. Lim's progress notes indicated that the plaintiff's treatment plan and medication regimen rarely changed (Tr. 266-316), the plaintiff generally felt

21

"well" or "fine" (Tr. 223, 226, 229-35, 240), and the prescribed medications were able to control the plaintiff's conditions. (Tr. 231-33, 237, 241.)

Dr. Lim's RFC evaluation is also inconsistent with the assessments of five other consultative physicians who conducted mental and physical assessments of the plaintiff. Dr. Davis, Dr. Cowden, and Dr. Richard's physical assessments of the plaintiff's ability to lift/carry, stand/walk, and sit during an eight hour workday are consistent with each other and contrary to Dr. Lim's RFC. (Tr. 155-57, 186-91, 192-99, 218-19.) In his psychological examination, Dr. Pettigrew found that the plaintiff was "at most mildly anxious" and showed no signs of acute psychological distress (Tr. 203), and Dr. Sachs concluded that the plaintiff "had no significant psychologically related loss of functioning." (Tr. 215-17.) The findings of Dr. Pettigrew and Dr. Sachs do not align with the "marked" restrictions Dr. Lim assigned to the plaintiff. (Tr. 218.) Therefore, Dr. Lim's medical opinions did not deserve controlling weight since his findings were not supported by objective medical evidence, his treatment notes, or the evidence in the record.

Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006)(quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given

to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ focused on the factors of consistency and supportability in discounting the severe functional limitations Dr. Lim assigned to the plaintiff. The ALJ stated:

> On consideration of the record the claimant does have a complaint of neck pain with a history of cervical laminectomy and back pain with evidence of lumbar degenerative disc disease, however he is a younger worker and I find nothing in the objective record that would preclude a full range of light work. Therefore I credit and concur with the DDS assessment for a full range of light work. I give little credit to the assessment by Dr. Lim. It is not consistent with the objective medical evidence of record and is clearly based on the claimant's subjective complaints.

(Tr. 16.) As previously addressed, Dr. Lim referred the plaintiff for only two x-ray exams over a four year period after his surgery, did not change the plaintiff's course of treatment, and repeatedly indicated that the plaintiff was doing well. Further, Dr. Lim's assessment of the plaintiff's mental and physical limitations did not align with the findings of any of the consulting physicians. The plaintiff's activities of daily living also conflict with Dr. Lim's findings. The plaintiff revealed that he "provides sole care and supervision" for his daughter, "satisfies all of his personal needs independently," holds a valid driver's license and drives a car, picks his daughter up from school, prepares meals for himself and his daughter, takes his daughter out to eat and to the movies, attends mass, visits with his sister daily, and goes to ball games. (Tr. 203, 337.) *See Hogg v. Sullivan*, 987 F.2d 328, 333 (6th Cir. 1993) (evidence that the claimant attended church, visited relatives, and related well to others supported a finding that the claimant did not have marked difficulty in maintaining social functioning); *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 150 (6th

23

Cir. 1990) (evidence that the claimant could care for her personal needs, manage her own finances, clean, shop, cook, read, watch television, drive, and occasionally go out to eat or watch a movie supported a finding that the claimant did not have marked restriction of activities of daily living).

Dr. Lim's assessment of the plaintiff was inconsistent with his own notes, unsupported by evidence of the plaintiff's daily activities, and inconsistent with the opinions of five other physicians. Furthermore, his prescribed treatment for the plaintiff over a four year period was subject to minimal variation and did not support his overall conclusion that the plaintiff was unable to work. The ALJ provided "good reasons," as required by Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), for awarding "little credit" to Dr. Lim's assessment of the plaintiff and substantial evidence in the record supports that determination.

### 2. Substantial evidence supports the ALJ's conclusion that the plaintiff's right eye condition was not "severe."

The plaintiff contends that substantial evidence does not support the ALJ's conclusion that the plaintiff's vision was not a "severe" impairment. Docket Entry No. 12, at 25. The regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). *See also Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986) ("An impairment can be considered not severe only if the impairment would not affect the plaintiff's ability to work regardless of his age, education, and work experience."). Following surgery in 2000, the plaintiff was diagnosed with Horner's Syndrome, which caused his right eyelid to droop and become

Case 3:05-cv-00109   Document 17   Filed 08/26/09   Page 24 of 32 PageID #: 90

photophobic, with blurred and double vision.[24] (Tr. 164-66, 224.)  However, a vision test completed in 2002, revealed that the plaintiff's uncorrected distance vision in his right eye was 20/30, in his left eye was 20/30, and in both eyes was 20/25. (Tr. 156.)

The plaintiff also testified at the hearing that his store-bought glasses left his vision "a little blurry," but he indicated that he needed to purchase a stronger pair of glasses. (Tr. 326.)  He also reported that there was no blurriness in his left eye. (Tr. 327.)  Given the plaintiff's testimony, objective medical evidence, and the plaintiff's ability to drive (Tr. 203) there is substantial evidence in the record to support the ALJ's conclusion that the plaintiff's right eye condition was not a "severe" impairment.

### 3. Substantial evidence supports the ALJ's conclusion that the plaintiff's anxiety disorder was not "severe."

The plaintiff contends that substantial evidence does not support the ALJ's conclusion that the plaintiff's anxiety disorder was not a "severe" impairment.[25] Docket Entry No. 12, at 25-26. Although Dr. Lim routinely diagnosed the plaintiff with anxiety, a "mere diagnosis . . . says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863.  The plaintiff argues that Dr. Lim has well documented and treated his anxiety disorder, but as the ALJ points out, the plaintiff never sought any mental health treatment or counseling and never had been hospitalized for a mental condition. (Tr. 15, 201.)  Although Dr. Lim prescribed medication for the plaintiff's anxiety and

---

[24] The ALJ incorrectly stated that the plaintiff "had surgery on his right eye because it was blurry." (Tr. 15) The plaintiff's blurred vision and ptosis followed surgery, but did not lead to it. (Tr. 164.)

[25] *See* 20 C.F.R. § 404.1521(a).

depression, it does not appear that he treated him in any other way for his mental health issues and never referred him to a psychiatrist, psychologist, therapist, or other mental health practitioner.[26] (Tr. 15, 201.)

The Court also notes that while Dr. Lim referred to the plaintiff's "[r]epeated episodes of decompensation, each of extended duration," Dr. Lim did not explain what the "[r]epeated episodes of decompensation" were nor did he provide any definition of "decompensation." (Tr. 219.) Although under the category of "Diagnosis, findings, test results that support [his] evaluation," Dr. Lim listed "panic disorders," (Tr. 219) his treatment notes do not substantiate "repeated episodes of decompensation" other than to reference the plaintiff's "true panic attacks." (Tr. 266, 269, 272, 276, 282, 285, 288, 291, 300, 304, 308, 312.) The Court notes that Dr. Lim included a virtually identical paragraph addressing the plaintiff's anxiety in all of his treatment notes from August 5, 2003, through August 6, 2004, without little or no variation or reference to the plaintiff's current circumstances. Further, Dr. Pettigrew, a psychologist, determined that the plaintiff's cognitive functions appeared to be intact and that he was "at most mildly anxious." (Tr. 203.) Dr. Sachs, a psychologist, also found the plaintiff to have "no significant psychologically related loss of functioning." (Tr. 217) Dr. Lim's own records repeatedly noted that the plaintiff's anxiety was "stable" (Tr. 220-234, 238, 241-42), and the plaintiff testified that he takes a Xanax when he feels anxious and then he is "okay." (Tr. 329.) The ALJ's conclusion that the plaintiff's anxiety disorder

---

[26] The plaintiff challenges the ALJ's conclusion that the plaintiff never sought mental health treatment since Dr. Lim treated him for his anxiety disorder by prescribing medication. Docket Entry No. 12, at 11. However, the plaintiff never sought treatment from a medical health treatment specialist inasmuch as Dr. Lim was a family practitioner.

26

was not a "severe" impairment is supported by substantial evidence in the record since it was based on the findings of two doctors, Dr. Lim's progress notes, and the plaintiff's own testimony.

### 4. The ALJ properly considered the plaintiff's obesity

The plaintiff contends that the ALJ violated Soc. Sec. Rul. 02-01p[27] by failing to find that obesity was a "severe" impairment and by failing to consider obesity in determining his RFC. The plaintiff was diagnosed with class 1 obesity by Dr. Davis in 2002 (Tr. 157), and between January of 2000 and May of 2004, he had a body mass index ("BMI")[28] ranging from 28.5[29] at 210 pounds (Tr. 229) to 31.3[30] at 231 pounds. (Tr. 221, 253, 255, 301.) Although the BMI is often correct, "someone with a BMI above 30 may not have obesity" and it "will usually be evident from the information in the case record whether the individual should not be found to have obesity, despite

---

[27] Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *1, provides that even though the Social Security Admininistration deleted the obesity listing it still

> consider[s] obesity to be a medically determinable impairment and remind[s] adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

[28] According to the Centers for Disease Control and Prevention at CDC.gov, BMI "is a number calculated from a person's weight and height . . . [and] is a reliable indicator of body fatness for most people."

[29] Clinical Guidelines define a BMI of 25-29.9 as overweight. Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *2 (citing NIH Publication No. 98-4083, September 1998).

[30] Clinical Guidelines describe a BMI of 30-34.9 as Level I obesity. *Id.*

27

a BMI of 30.0 or above." Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *2.[31] The record reflects that the plaintiff was diagnosed with obesity only once over the course of five years. (Tr. 157)

Even though obesity is to be considered during the disability determination, it "*may or may not* increase the severity or functional limitations of the other impairment" and should be evaluated on a case by case basis. Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *6 (emphasis added). Moreover, obesity "is 'not severe' only if it is a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities." *Id.* at *5. Although the plaintiff argues that his obesity was not properly considered, he has never alleged that this impairment has had any effect on his ability to work. (Tr. 64, 325-34.) Further, no physician has ever attributed the plaintiff's limitations directly to obesity. The ALJ properly considered the plaintiff's single diagnosis of class 1 obesity in his analysis (Tr. 16), therefore satisfying the requirement of Soc. Sec. Rul. 02-01p.

### 5. The ALJ properly applied the Medical-Vocational Guidelines

The plaintiff contends that he has significant nonexertional limitations, specifically the postural limitations assigned to him by Dr. Richard, that allow him to "occasionally" climb, stoop, and/or crawl. (Tr. 194.) As previously addressed, once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five of the evaluation process to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky*,

---

[31] Although Dr. Davis provided a diagnosis of class I obesity, it appears that he simply made a mechanical calculation and did not engage in any other analysis.

28

35 F.3d at 1035. To rebut a *prima facie* case, the Commissioner must come forward with particularized proof of the plaintiff's individual vocational qualifications to perform specific jobs. *O'Banner v. Sec'y of Health, Education & Welfare*, 587 F.2d 321 (6th Cir. 1978).

Alternatively, in certain instances, the Commissioner is entitled to rely on the medical vocational guidelines ("Grid") to overcome the plaintiff's prima facie case of disability. *Heckler v. Campbell*, 461 U.S. 458 (1983); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, *Kirk v. Heckler*, 461 U.S. 957 (1983); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 200.00. The Grid may be applied only when the fact finder decides that a claimant's nonexertional impairment does not significantly limit his ability to do a full range of work at a designated level. *Todd v. Apfel*, 8 F. Supp. 2d 747, 756 (W.D. Tenn. 1998) (citing *Kirk*, 667 F.2d at 528). In other words, it is only when the alleged nonexertional impairment is severe enough to prevent the claimant from performing a wide range of jobs at the designated level that the application of the Grid is precluded. *Id.* at 756-57. *See also Kimbrough v. Sec'y of Health & Human Servs.*, 801 F.2d 794, 796 (6th Cir. 1986) ("[T]he mere possibility of a nonexertional limitation is insufficient [to preclude the application of the Grid]. Not even a minor nonexertional limitation is enough; the claimant must show an impairment that significantly limits his ability to do a full range of work at a designated level.") The Grid may be used to obtain the ultimate conclusion of disability when the findings of fact as to the plaintiff's age, education, work experience, and residual functional capacity correspond precisely with the components of the relevant rule. *Kirk*, 667 F.2d at 528.

The Court has found that there was substantial evidence to support the ALJ's determination that the plaintiff's right eye condition and anxiety disorder are not severe. Thus, the Court's analysis focuses on postural limitations Dr. Richard assigned to the plaintiff that allow him to "occasionally"

29

climb, stoop, and/or crawl. (Tr. 194.)  In evaluating the plaintiff's nonexertional limitations, he only needs to be able to stoop occasionally to perform substantially all requirements of a full range of light work. Soc. Sec. Rul. 83-14, 1983 WL 31254, at *4.  Further, examples of "nonexertional limitations or restrictions which have very little or no effect on the unskilled light occupational base" are an individual's "inability to ascend or descend scaffolding, poles, and ropes; inability to crawl on hands and knees." Soc. Sec. Rul. 83-14, 1983 WL 31254, at *5.  Since the plaintiff's assigned nonexertional limitations are not severe, the ALJ was not precluded from using the Grid in assessing the plaintiff's exertional impairments.

### 6.  Substantial evidence supports the ALJ's conclusion that the plaintiff could perform a full range of light work.

The plaintiff asserts that the record is devoid of any evidence that would support the ALJ's conclusion that the plaintiff could perform a full range of light work.  He again relies on the opinion of Dr. Lim as his treating source, who reported that in an eight hour day the plaintiff could not sit at all and could stand/walk only one hour before changing position. (Tr. 218.)  Dr. Lim also opined that the plaintiff must lie down for two hours and elevate his legs for five hours, and could occasionally lift up to nine pounds and rarely lift up to 19 pounds. *Id.*  In an eight hour workday, Dr. Lim stated that the plaintiff could spend only 30  minutes reaching and no time handling or stooping. (Tr. 218-19.)  The plaintiff contends that Dr. Lim's exertional limitations would preclude work at the light and sedentary level of exertion.

As previously addressed, Dr. Lim's medical opinion was not supported by his own treatment notes and was inconsistent with evidence in the record.  Dr. Davis, Dr. Cowden, and Dr. Richard all opined that the plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10

30

pounds. (Tr. 157, 187, 193.) Dr. Davis and Dr. Cowden also concluded that in an eight hour workday the plaintiff could stand/walk six hours and sit eight hours, and Dr. Richard determined that the plaintiff could stand/walk and sit for six hours. *Id.* The clinical findings of Dr. Davis, Dr. Cowden, and Dr. Richard do not align with Dr. Lim's opinion.

Additionally, the plaintiff reported that he is able to drive, independently care for his personal needs, go out to dinner and to the movies, attend mass, visit his sister daily, and go to ball games. (Tr. 203, 337.) The plaintiff's daily activities are also inconsistent with Dr. Lim's opinion. Considering the record as a whole and the "little credit" that the ALJ properly afforded Dr. Lim's opinion, there is substantial evidence to support the ALJ's conclusion that the plaintiff could perform a full range of light work.

31

## V.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 11) be DENIED and that the decision of the ALJ should be affirmed..

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge